UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA          CRIMINAL NO. 05-50112

versus                                          JUDGE STAGG

FERNANDO HERRERA                  MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

### Introduction

Before the court is Defendant's Motion to Suppress Drugs and Statement (Doc. 9).

An evidentiary hearing on the motion was held on March 14, 2006 and was resumed on

May 1, 2006 to take additional evidence. For the reasons that follow, it is recommended that

Defendant's motion be denied.

### The Evidence

On November 10, 2004, Officer Ken Carlson of the Arizona Highway Patrol observed

a vehicle with Texas license plates driven by Defendant traveling at 75 mph in a 65 mph

zone. Tr. 39, 84. Carlson activated his emergency lights and pulled Defendant's vehicle

over on the right shoulder of Interstate 40 near Flagstaff, Arizona. There was no reason to

stop the car other then its speed. Tr. 65. The counter on the videotape of the stop shows the

stop began at approximately 15:50 hours or 3:50 p.m. Tr. 86. The battery in Carlson's

microphone was dead, so there is no audio of the stop. Tr. 54, 60. Officer Springstun arrived

on the scene to assist Carlson at about 15:55. Tr. 53, 87.

Carlson identified Defendant as the driver of the vehicle. When Defendant handed his driver's license to Carlson, Carlson observed that Defendant's hands were shaking badly. Tr. 40. Defendant told Carlson that the vehicle belonged to a friend and, therefore, Defendant did not have registration for the vehicle.[1] Carlson noticed that the passenger in the vehicle, Mario Ruiz, appeared to be very tense and stared straight ahead. Tr. 41. Carlson then asked Defendant to follow him back to his patrol car. When asked why he did so, Carlson testified:

> Every traffic stop I make, like I said, I do it the same way. I always bring the driver back and I speak with them about their travel, what they, you know, what they're doing, just to be a friendly officer. When somebody drives through Arizona from a different state or whenever (sic), I want to present a good image for the department. And I think what does that is talking with people, being friendly with people. And that's what displays our department in a good light and being a good officer is all about.

Tr. 71-72. At the time of the stop, Carlson had been a trooper for about five years.

Carlson asked Defendant who owned the vehicle, and Defendant said that the vehicle belonged to a friend, Jason Turner. The sales agreement in Defendant's possession confirmed that fact. Tr. 41. Defendant stated he was taking the vehicle from Phoenix, Arizona to Arlington, Texas to return the vehicle to Mr. Turner. Tr. 42. Defendant stated that Mr. Turner had driven the vehicle to Phoenix, where the vehicle had broken down.

---

[1] Defendant possessed a sales agreement for the vehicle instead of a valid registration. Other than that, Defendant was "street legal" and possessed a valid driver's license and proof of insurance. Tr. 69-70.

Defendant stated that Mr. Turner then flew back to Arlington.  Defendant could not explain why Mr. Turner did not fix the vehicle and drive it back.  Tr. 42.

During the conversation, Carlson noticed that Defendant avoided eye contact and was breathing hard, which Carlson interpreted as signs of nervous behavior.  Tr. 42-43.  Carlson testified that Defendant stalled before answering Carlson's questions and displayed false laughter.[2]  Carlson asked Defendant if he was okay, and Defendant responded that he was just cold.  Tr. 43.

Carlson asked Defendant for the identity of the passenger in his vehicle, and Defendant stated that the passenger was a good friend and roommate named Mario.  Tr. 43.  Defendant could not remember Mario's last name.  Id.  Defendant told Carlson that Mario's father passed away recently and they attended the funeral in Mexico on *Sunday*.  Carlson then asked Defendant to wait by the patrol car while Carlson checked the registration sticker on the vehicle.  Carlson approached the passenger side of the vehicle and again noticed that the passenger seemed very nervous.  Tr. 44-45.  The passenger, Mario, stated they were going to Arlington.  He stated he had attended his father's funeral on *Friday*.  Mario knew that Defendant's first name was Fernando, but he did not know Defendant's last name.  Tr. 45.  Carlson also noted that Mario was breathing hard.

---

[2] Regrettably, none of this can be confirmed or disproved by the video, because (1) there is no audio; and (2) virtually all of the contact between Carlson and Defendant took place in the grassy area to the right of the highway – just out of view of the dashboard video camera.  Tr. 62, 64.

On cross-examination, Carlson admitted he was not just being "Mr. Friendly Officer" and that he was acting more as an investigator to determine if Defendant and Mario "[had] their stories together." Tr. 72-73. According to Carlson, based on the "indicators of criminal activity [he] had already seen,"... [his] suspicions were rising at that point a lot." Tr. 73. Carlson identified those indicators as: (1) the registered owner of the vehicle was not present; and (2) extremely nervous behavior by Defendant, such as stalling when answering questions. Id. Carlson believed those things "are not consistent with the innocent motoring public." Id. However, Carlson admitted that it is common for motorists to be nervous when stopped by the police. However, he testified it is not common for such nervousness to continue throughout the entire traffic stop. Id.

Back at the patrol car, Carlson told Defendant he would receive a warning for speeding, and he asked Defendant to sign the warning. Tr. 46. Defendant complied. Carlson again noticed that Defendant's hands were shaking. Tr. 46. At some point during one of the conversations near the patrol car, Defendant told Carlson that Defendant had a concealed weapons permit because Defendant worked in security. Tr. 52-53. Defendant stated that he did not have any guns in the vehicle, and he offered to let Carlson search the vehicle to confirm that. However, Carlson did not accept that offer and did not search the vehicle for guns. When asked why he did not take Defendant up on that offer, Carlson testified: "There was no gun. He told me there was no weapon in there." Tr. 77.

At approximately 4:03 p.m., Defendant was given all of his paperwork *and was told he was free to leave*.[3] As Defendant began returning to his vehicle, Carlson called him by name and asked him if he could ask him a couple of questions [video 16:03:23].[4] Carlson explained to Defendant that there is a problem on Interstate 40 with people transporting illegal contraband. He then asked Defendant if Defendant had any contraband, and Defendant said no. Tr. 46. Carlson testified that Defendant then offered to let Carlson search the vehicle. Tr. 46. Carlson also testified that, even though Defendant had offered to allow him to search, Carlson nevertheless asked Defendant if he could search the vehicle. According to Carlson, Defendant said yes.[5] Id. Carlson then approached the passenger side of the vehicle and asked Mario if he could search the car. Mario said he did not care because it was not his car. Tr. 46-47. Carlson had access to a written consent form, but he did not ask Defendant to sign it because, at that time, it was not department policy to do so. Tr. 53, 74.

---

[3] Interestingly, Carlson did not check Defendant's driving record until *after* Carlson had decided to issue the warning ticket. Tr. 68. This sequence of events seems unusual, but it perhaps has less significance in this case given Carlson's admission that Defendant was *never* free to leave. In any event, the check revealed that Defendant had no outstanding warrants and he had a valid driver's license. Tr. 65, 69.

[4] This procedure is known as the Lt. Columbo gambit ("one more thing ..."). 4 LaFave, Search and Seizure (4th Ed.) § 9.3(g) at 402. Apparently, the procedure is widely used. See, e.g., United States v. Foreman, 369 F.3d 776, 779 fn. 4 (4th Cir. 2004)("Trooper Wade testified that, at a traffic stop, he often returns the driver's paperwork and allows him to leave his patrol car and start walking away. At that point, when the circumstances of the stop are less (or non) custodial, Trooper Wade asks for the driver's consent to search the vehicle."); United States v. Sanchez, 417 F.3d 971, 974 (8th Cir. 2005).

[5] Defendant's version of this exchange is significantly different, as explained in a later section of this Report and Recommendation.

On cross-examination, Carlson admitted that, although he told Defendant that he was free to leave when he handed Defendant the warning ticket, Defendant was, in fact, not free to leave. Carlson admitted that, in his (Carlson's) mind, *Defendant was never free to leave.* Tr. 82, 90. Had Defendant indicated that he wished to leave the scene, Carlson would have told Defendant that he was being detained. Carlson wanted Defendant to believe that he was free to leave, even though Defendant was not free to leave, so that the remainder of the contact with Defendant would become consensual. Tr. 79. Carlson testified he does that for "court purposes" more than anything else. Tr. 80. According to Carlson: "The entire time, I felt there were illegal narcotics in the car and I wanted to find them." Tr. 90-91.

**The Road-Side Search**

The video depicts the extensive road-side search of the vehicle, which began at approximately 4:06 p.m., or sixteen minutes after the traffic stop began [video 16:06]. During the search, Officer Springstun stood with Defendant and Mario in the grassy area out of view of the videotape. Tr. 88. The video shows that Carlson opens the trunk and removes clothing (and the carpet mat) from the trunk [video 16:09]. He looks under the trunk area of the car. He then searches the interior of the car [16:11]. He looks in the gas tank lid [16:14]. He uses a flashlight to look under the car [16:19]. He then has conversations with Defendant and the passenger [16:21]. He then returns to Defendant's car, puts the carpet from the trunk down on the asphalt and lays on the carpet to look under the car. [16:22]. He looks inside

the passenger door [16:24]. He walks around the front of the car and searches the interior on the driver's side [16:26].

Officer Sherry Johnson then enters the picture [16:29] and assists in the search. She and Carlson lift the hood of the car and search the engine compartment [16:32]. Carlson then looks under the trunk [16:42] and the right rear wheel area [16:43]. He again searches under the trunk [16:44]. He then searches the interior of the trunk area [16:52]. He looks in the passenger door area [16:53]. He then returns to the trunk area [16:54]. Another male officer then enters the picture [16:55]. This other male officer and Carlson both look under the trunk [16:55].

About thirty minutes into the search, Carlson called for a K-9. Tr. 88. The K-9 (Kay) and her handler (Officer John Adams) arrived at about 4:55 p.m., which was about eighteen minutes after Adams received the request for a K-9. Tr. 24-25. They first appear in the video over an hour after the traffic stop began and about an hour after Officer Springstun arrived [16:59]. Tr. 88, 24. Adams directed the K-9 to the rear of Defendant's car and walked the K-9 down the right side of the vehicle. Adams testified and the video confirms that the K-9 showed some interest (but did not alert) on the passenger side of the vehicle. Tr. 18. Adams walked the K-9 across the front of the vehicle and back down the driver's side. The dog showed strong interest and actually alerted in an area between the front and

rear doors on the driver's side of the vehicle [17:02]. Tr. 10, 19, 33. The K-9 is rewarded and returned to Adams' patrol car.[6]

The officers continue their search of the car until the video ends at about 17:23, which is approximately 90 minutes after the stop began. Despite this additional thorough search, no contraband was found. Tr. 99, 29. During the search, however, Carlson noticed that some of the screws in the dashboard had been removed, but no drugs were ever found in the dash area. Tr. 99. Defendant and Mario were handcuffed, and the car was removed to fleet services. Tr. 93. They were not told they were under arrest and they were not read their rights. Id.

At some point prior to the removal of the vehicle to fleet services, Adams took either Defendant or Mario's pulse. Tr. 11, 36. Adams received no training in taking a person's pulse; he just picked it up on his own. Tr. 22. The Arizona State Police has no policy requiring consent before taking a person's pulse, but Adams testified he never took anyone's pulse without permission. Tr. 38. He believes he had permission to do so in this instance, although he could not remember. Id. The pulse was approximately 160 beats per minute,

---

[6] The evidence shows that Officer Adams and Kay received extensive training and were properly certified, and they participated in a large number of highway sniffs. Tr. 7-9. Initially, Adams testified that about 75 percent of the time Kay alerted on vehicles, drugs were found. Tr. 8. However, in follow-up questioning by the court on that point, Adams testified that the percentage of time where drugs are found after the dog alerts is "probably up in the lower to mid 90's percentile." Tr. 35. Further clarifying his testimony, Adams testified: "The 75 percent of the time that I would utilize my dog is I guess when you would have, you would find drugs, and there would be an arrest. But as far as the dog goes, probably upper to mid 90 percent of the time that the dog alerted, there would either be activity of drugs, there would be the odor of drugs." Tr. 35-36.

which is the highest that Officer Adams had ever seen.  Tr. 12, 22.  Adams testified that he would normally see a pulse of 130 or 140, and that a pulse of 160 is "about peaked out."  Tr. 22-23.  He referred to a pulse level of 160 as "almost ambulance."  Tr. 23.[7]  Officer Adams did not know whether the pulse was taken before or after the K-9 alerted on Defendant's vehicle.  Tr. 36.

**The Search and Interview at Fleet Services**

At fleet services, the vehicle was placed on a lift.  The interior door panels were removed, and a paper towel became visible in the panel of the passenger-side rear door.  When the paper towel was removed, the officers discovered a bundle wrapped in gray tape.  The bundle was removed and found to contain methamphetamine.  In all, five bundles of methamphetamine were found: three bundles in the panel of the passenger-side rear door and two bundles in the panel of the driver-side rear door.  The drugs were found at approximately 7:30 p.m., or approximately three and a half hours after the start of the search of the car.  Tr. 94.  Carlson conceded that, prior to the time the drugs were found at fleet services, the officers did not have probable cause to arrest Defendant for anything.  Tr. 100.  Adams, on the other hand, testified that the canine alert "is probable cause for an arrest at that point."  Tr. 32.

Detective Mike Livingston interviewed Defendant following removal of the vehicle to fleet services, during which the search of the vehicle continued.  Tr. 104.  When

---

[7] Adams testified that if the person's pulse is about 100, which he classified as normal, that might help in the decision to terminate the stop and release the person.  Tr. 36.

Livingston arrived at fleet services, Defendant was seated inside the area where the vehicles were located. Defendant was not handcuffed at this time. Tr. 109. Livingston took Defendant into a separate room and had what Livingston described as a "casual conversation" with Defendant. Mario remained in the garage area with the other officers. Tr. 105. Initially, Livingston did not advise Defendant of his rights. Tr. 106. Livingston asked Defendant about his travel plans at the time of the stop. Livingston testified that Defendant's story "jumped around" and was hard to follow. Tr. 106.

Livingston testified that he told Defendant that he was not in custody, but Livingston admitted that he did not tell Defendant that he was free to leave. Tr. 110. In fact, Livingston admitted that Defendant was not free to leave. According to Livingston, Defendant was not in custody, but he was being detained. Id. At approximately 7:27 p.m., when one of the other officers came into the room and said they had found illegal drugs, Livingston then read Defendant his Miranda rights and placed him under arrest. Tr. 106, 111. Defendant was then transported to the narcotics office about four blocks away. Tr. 107.

At the narcotics office, Defendant stated that he wished to make a statement. A portion of the interview by Livingston was recorded, but at Defendant's request, the tape recorder was turned off. Tr. 107. Livingston denied any conversation with Defendant about releasing the passenger (Mario) if Defendant took responsibility for the drugs. After the tape recorder was turned off, Defendant stated that the drugs were "fronted" to him and that he was taking the drugs to Texas. Defendant also told Livingston that the weight of the methamphetamine was approximately two pounds. Tr. 107-108.

**Defendant's Testimony**

The Government did not provide a copy of the video of the stop to counsel for Defendant until the day of the suppression hearing, so it was necessary to leave the record open to give the defense an opportunity to review the video. Tr. 123-124. Defendant's testimony was the only new evidence offered at the continuation hearing. His version of the events is different in several important respects than that offered by the officers. He testified he was shaking because he was cold, not because he was nervous. Supp. Tr. 5. (The video at 16:06:13 confirms that Defendant and Mario were given their coats from the vehicle about the time Carlson began the search.)[8] He also testified that, as Carlson was writing the warning ticket for speeding, the officer asked, "Can I ask you a question?" Defendant replied, "Yeah. What's up?" The officer then told Defendant that he had out of state license plates, and "most out of state license plate, they carry drugs or guns or money."[9] Id. Defendant then showed Carlson his concealed weapons permit. Supp. Tr. 6. However, Carlson did not ask to search the car at that time.

Carlson then gave Defendant the warning ticket, and as he was walking back to his car, Carlson said, "Excuse me." Defendant turned around. While motioning with his hand for Defendant to come back, Carlson stated: "You come over here?" or "Can you come

_____

[8] Weather archive resources available on the internet indicate that the temperature in Flagstaff near the time of the stop was approximately 49 degrees.

[9] The transcript of Defendant's testimony shows that while he speaks and understands the English language, it is certainly not his primary language. At times during the hearing, he was difficult to understand and had to be asked to repeat himself.

back?" Defendant replied, "Yes." Supp. Tr. 7. Defendant returned to the officer's location. Carlson then asked Defendant if he minded Carlson "looking around in the vehicle." Supp. Tr. 7-8. Defendant testified that he told Carlson he was in a hurry. Carlson responded that it was only going to take a few seconds. Carlson stated: "I'm just going to look in the vehicle very fast." Defendant replied that if it was going to take a few seconds, then "Yeah, sure." Supp. Tr. 8. Defendant testified he did not understand that Carlson was actually going to search the inside of the vehicle. Id.

Defendant also testified that during the search he asked both Carlson and the female officer if he could leave. Supp. Tr. 9, 16, 18. Carlson said, "No, [not] until the dog comes." The female officer deferred to Carlson as the stopping officer.

Defendant testified that after he was transported to fleet services, he talked to Officer Livingston. Once the drugs were discovered, Livingston told Defendant that if he took the blame for the drugs, Defendant would be a "better man," and the passenger (Mario) would be released. Supp. Tr. 11, 18. According to Defendant, Mario was released about three days later.

**Arguments**

Defendant's Motion to Suppress argues that the drugs found during the search and the subsequent interview of Defendant should be suppressed because Carlson did not have probable cause to stop Defendant's vehicle; that Carlson did not have reasonable suspicion or probable cause to detain Defendant and request consent to search Defendant's vehicle; Defendant's consent was not knowingly, intelligently and freely given; and the statements

made by Defendant to Livingston should be suppressed as fruit of the poisonous tree.  The

Government argues that the officers had probable cause to stop Defendant for speeding, and

that there was reasonable suspicion of criminal activity to justify detaining Defendant for

further investigation.  According to the Government, that suspicion was heightened when,

following Defendant's voluntary consent to search the vehicle, the K-9 alerted.

**Applicable Law – General Principles**

The Fourth Amendment protects individuals "against unreasonable searches and

seizures."  U.S. Const. amend. IV.  Traffic stops are deemed seizures for the purposes of the

Fourth Amendment. United States v. Valadez, 267 F.3d 395, 397 (5th Cir.2001).  The

legality of a traffic stop is analyzed under the framework articulated in Terry v. Ohio, 392

U.S. 1 (1968). See Knowles v. Iowa, 525 U.S. 113, 117 (1998); Berkemer v. McCarty, 468

U.S. 420, 439 (1984); United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004)(en banc).

Under the two-part Terry reasonable suspicion inquiry, the court must determine whether the

officer's action was: (1) "justified at its inception"; and (2) "reasonably related in scope to the

circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20;

Brigham, supra at 506-507; U.S. v. Lopez-Moreno, 420 F.3d 420, 429-434 (5th Cir. 2005).

For a traffic stop to be justified at its inception, an officer must have an objectively

reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred,

or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100,

102 (5th Cir.1995). The Supreme Court has stated that in making a reasonable suspicion

inquiry, a court "must look at the 'totality of the circumstances' of each case to see whether

the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Cortez, 449 U.S. 411, 417 (1981). Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure. See, e.g., United States v. Santiago, 310 F.3d 336, 340 (5th Cir.2002). In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other. Arvizu, 534 U.S. at 274. In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice. Terry, 392 U.S. at 27. It is also clear, however, that reasonable suspicion need not rise to the level of probable cause. Arvizu, 534 U.S. at 274.

As for the second prong of the Terry inquiry, generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Brigham, 382 F.3d at 507. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen. Id. at 507-08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508. Indeed, the officer's questions *need not even be related to the purpose of the traffic stop*, since "[d]etention, not questioning, is the evil at which Terry's second prong is aimed." Id.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter,

continued questioning thereafter unconstitutionally prolongs the detention. Brigham, 382 F.3d at 510. See also Santiago, 310 F.3d at 341-42; United States v. Jones, 234 F.3d 234, 241 (5th Cir. 2000); United States v. Dortch, 199 F.3d 193, 200 (5th Cir.1999), *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).

An officer's subjective intentions have no impact on analyzing reasonable suspicion or probable cause because they are both considered to be based on an objective test. The Supreme Court has made it clear that an officer's subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment. Scott v. United States, 436 U.S. 128, 138 (1978); Devenpeck v. Alford, 543 U.S. 146 (2004) ("Our cases make clear that an arresting officer's state of mind ... is irrelevant to the existence of probable cause. [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."); Whren v. United States, 517 U.S. 806 (1996) ("We think these cases ... foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved."). On this point, the Fifth Circuit has stated that "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic

infraction is irrelevant for purposes of the Fourth Amendment ...." Goodwin v. Johnson, 132 F.3d 162, 173 (1997).

**Pre-<u>Brigham</u> Decisions**

Several pre-<u>Brigham</u> cases, due to their similar facts and circumstances, are instructive in the resolution of the issues before the court: United States v. Dortch, 199 F.3d 193 (5th Cir. 1999) *corrected on denial of rehearing*, 203 F.3d 883 (5th Cir. 2000), United States v. Santiago, 310 F.3d 336 (5th Cir. 2002) and United States v. Jones, 234 F.3d 234 (5th Cir. 2000).

In <u>Dortch</u>, two officers stopped a vehicle at approximately 11:30 p.m. for traveling too close on I-20 in Beaumont, Texas. The driver exited the car at the officer's request and produced his license and car rental papers, and he consented to a pat down search for weapons. No weapons were found. The officer examined the rental papers and determined that the car was rented to a third person and the driver was not listed as an authorized driver. The officer then questioned the driver and his passenger. The men gave inconsistent answers about the driver's relationship to the person who had rented the car and their travel plans.

While one officer questioned the driver, the other officer performed a computer check for warrants and to determine whether the car was stolen. About eight minutes into the stop and while the computer check was pending, an officer requested consent to search the vehicle. The driver gave consent to search the trunk, but not the vehicle; no search was performed at that time.

The officers told the driver he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a K-9 search of it. A K-9 unit was then called. The driver was again patted down for weapons and again nothing was found.

About 14-15 minutes into the stop, the officers received the driver's criminal record and questioned him about it. The driver was not told that the computer check was complete, although it was, or that the driver would be free to go at any time. Approximately 19-20 minutes after the stop began, the officers noticed the arrival of the K-9 across the four-lane interstate and median. At that time, they informed the driver that the computer check had been completed and turned up nothing, but that the K-9 was going to perform a search nonetheless. The driver remained at the scene, and his driver's license and rental papers remained with the officers on the clipboard.

Another ten minutes elapsed during the K-9 search. The K-9 alerted on the driver's side door and seat. However, the subsequent search of the car uncovered no contraband. The K-9 handler then informed another officer that there could be contraband on the body of the person who had been sitting in the driver's seat. The driver then consented to a third pat down search. This time, however, the officer conducted a more thorough search of the driver's person and noticed a large hard bulge in his crotch area. The bulge was bags of cocaine. The driver was later charged with and found guilty of possession with intent to distribute cocaine.

On appeal, the driver did not question the legality of the initial stop, the K-9 search of the vehicle or the first two pat down searches. Instead, he argued that at some point the detention became unreasonable and exceeded the scope of intrusion allowed under Terry and, therefore, the subsequently discovered cocaine was inadmissible as fruit of the poisonous tree. Alternatively, he argued that the third pat down search was itself unreasonable because of a lack of probable cause or consent.

The Fifth Circuit found that, while the detention and questioning of the driver during the running of the computer check was lawful, the Constitution was violated when the detention extended beyond the valid reason for the initial stop. Dortch, 199 F.3d at 198. The driver did not feel free to leave even after the computer check was completed, because the officers still held his license and rental papers and they told him they were going to detain the car until the K-9 arrived. The driver's acquiescence to stick around while the dogs completed their search could not be considered voluntary.

There was no reasonable suspicion that the driver was involved in drug trafficking. Id. at 199. The answers he and the passenger gave, even if suspicious, did not give rise to that inference. Rather, the answers gave rise only to a reasonable inference that the car might have been stolen. When the computer check came back negative, the driver should have been free to leave at that point. Once he was not permitted to drive away, the extended detention became an unreasonable seizure because it was not supported by probable cause.

The officers offered no justification for the 9-10 minute delay in requesting the K-9. Id. at 200. The officer's main duty was drug interdiction, including checking suspected

vehicles for narcotics. It was reasonable, therefore, to expect that they would have anticipated needing a K-9 within a few minutes of stopping a suspect. Although the dog's alert on the car established probable cause to search the interior of the car and to detain the driver until a more thorough search could be completed, by then it was too late – any probable cause established as a result of the K-9 search was subsequent to the unlawful seizure. Id.

The Court then addressed the issue of consent. Although the driver's detention exceeded the scope of a Terry stop, his consent to search may, but does not necessarily, dissipate the taint of a prior Fourth Amendment violation. Where there has been a prior constitutional violation, the government's burden to prove the defendant consented becomes more difficult. Id. at 201. Consent does not remove the taint of an illegal detention if it is the product of an illegal detention and not an independent act of free will. Id. at 202. In light of the prolonged unlawful detention of the driver, and in light of the fact that his previous refusals to consent to searches of the car were seemingly ineffective, the Court found that his consent could not be considered an independent act of free will. The Court noted that it was apparent from the videotape that the officers intended all along to detain the car until the dog arrived.

The Fifth Circuit concluded that, even if the driver's consent was voluntarily given, the consent was not valid. Because the causal chain between the illegal detention and the consent to the third body search was not broken, the search was nonconsensual. And because

there was no probable cause to search the driver's person, the evidence obtained during that search should have been suppressed.  Id. at 202-203.

In United States v. Santiago, supra, the trooper pulled the defendant over on the belief that the motorist's view was unlawfully obstructed by trinkets hanging from the motorist's rearview mirror.  310 F.3d at 338-39. The defendant also was traveling 50 mph in a 70 mph zone.  After stopping the motorist, the trooper began to suspect that the car was stolen: the driver appeared nervous because his hands were shaking, the driver was traveling straight through to a distant destination, the driver could not remember his wife's name, the driver's vehicle was registered in another woman's name who was not the defendant's wife, and the driver had an explanation that was inconsistent from that of his passenger as to the parties' ultimate destination.

The officer then ran a computer check of the defendant's license and registration, which eventually came back negative.  Instead of returning the defendant's license and registration, the trooper called for and waited for backup.  The officer then explained problems with drugs being smuggled on the interstate highways, and he asked for and obtained consent to search the car.  A sealed compartment was discovered in the trunk.  The trooper then called for a K-9 which alerted on the car.  A subsequent search at the state police headquarters revealed drugs concealed within a false floor.

The Fifth Circuit concluded that the factors upon which the officer relied were insufficient as a basis for reasonable suspicion of drug activity because the officer had not articulated an objective basis to warrant a finding that Santiago had narcotics in his vehicle

sufficient to justify the extended detention of him. Id. at 342. The trooper's original justification for the stop ended at the time the computer check was completed. At that point, there was no reasonable suspicion that the defendant was trafficking in drugs, but the trooper nonetheless continued his interrogation. The court also noted that Santiago was stopped at 9:00 a.m; the highway on which he traveled was not deemed a major drug corridor; and Santiago's computer check did not elicit that he had a prior arrest or criminal record. There also was no evidence that, before asking for consent to search, the trooper had returned the driver's license and registration to defendant or told him that he was free to go. Under the circumstances, it was unreasonable for the trooper to continue to detain the defendant after the records check was completed. The Fifth Circuit concluded that the defendant's consent to search was not an independent act of free will, but rather a product of an unlawfully extended detention. Id. at 343.

In Jones, an officer pulled a motorist and his passenger over for a speeding violation. 234 F.3d at 237. The officer detained the defendant three minutes beyond the completion of the computer check, obtained the defendant's consent to search his vehicle, and subsequently found illegal narcotics. Id. at 241-42. The officer's basis for reasonable suspicion of drug activity pointed to the following facts: the defendant's inconsistent statement's regarding his place of employment, the defendant's contradictory responses about his passenger's employment, and the fact that the defendant's passenger had been previously arrested for a cocaine charge. Id.

The Fifth Circuit concluded that, based on the totality of the facts, that officer's three minute detention of Jones after the completion of the computer check was unreasonable. Jones was stopped in the morning (11:57 a.m.); Jones was not traveling on a known drug corridor; and neither Jones, nor his passenger, had criminal histories. Compared to the facts in Dortch, the Fifth Circuit explained that the trooper's bases for reasonable suspicion were even less suggestive of reasonable suspicion and were "at best trivial." Id. at 241. The defendant's consent to search was not valid because the causal chain between the illegal detention and the consent was not broken. Id. at 342. Therefore, the search was nonconsensual. Id.

**Brigham**

Against the backdrop of Dortch, Santiago and Jones, the court now turns to Brigham. Brigham did not overrule Dortch, Santiago and Jones, and later Fifth Circuit cases continue to cite them. See, e.g., United States v. Schlieve, 159 Fed. Appx. 538 (5th Cir. 2005); United States v. Powell, 137 Fed. Appx. 701, 709 (5th Cir. 2005); Lopez-Moreno, 420 F.3d 420, 431. Indeed, Brigham cited (and, at times, distinguished) Dortch, Santiago and Jones. 199 F.3d at 506, 507, 508, 510 and 511. However, as one district judge aptly observed, it is difficult to reconcile Dortch, Santiago and Jones with Brigham. See United States v. Leyva, 2006 WL 496016 *4 (W.D. Tex. 2006). Nevertheless, Brigham was decided by the en banc court, and this court must view it as controlling.

In Brigham, the driver and three friends were pulled over at approximately 4:13 p.m. on a highway in East Texas for following too closely. The officer approached the driver and

asked him to step out of the car and provide his license and insurance papers. The driver complied and produced a car rental agreement listing a 50 year old female as the lessee. No other drivers were authorized on the rental agreement. It did not appear that the 50 year old female was among the passengers in the car, so the officer became suspicious. The officer began asking the driver a series of basic questions about his group's travel plans. The driver stated they were coming from Houston. The driver stated they had stayed at a La Quinta Inn, but he had difficulty explaining where the motel was located. The driver also avoided eye contact and appeared to be extremely nervous. He responded to the officer's questions with questions of his own. Based on the officer's experience, he believed the driver was fabricating answers to the questions, and the officer decided to verify the driver's story with other occupants of the car.

At 4:17 p.m., four minutes after the stop began, the officer asked a passenger to step out of the vehicle. The passenger produced an I.D. card that the officer suspected was fake. The passenger's description of the group's travel plans was inconsistent with that offered by the driver. The passenger also avoided eye contact and appeared extremely nervous.

At 4:20 p.m., the officer questioned the other two occupants. Both appeared confused and also were inconsistent concerning the group's travel plans. The officer then returned to his car to run computer checks on the car and the I.D. cards he had received. He told the driver that if his license was clean, they would soon be back on their way. Even though the car checked out, the officer remained suspicious given the behavior of the driver and occupants, their inconsistent descriptions of their travel plans and because, in his experience,

the fact that a car is not yet reported stolen does not necessarily indicate that it was not actually stolen.

At 4:29 p.m., the results of the I.D. checks suggested that one of the occupant's I.D. card was likely a fake. The officer confronted that occupant and eventually learned his real name. The officer then returned to his car to check the occupant's actual identity. While that check was pending, the officer requested and received back-up from another officer.

The officer then provided the driver with a written warning for following too closely and returned his driver's license to him. He explained to the driver that one of his responsibilities was to intercept illegal contraband such as guns, stolen property and narcotics. The driver denied that any illegal items were in the car and acceded to a request for a search. The officer removed all of the passengers from the car and patted them down. At 4:42 p.m., approximately thirty minutes after the stop began, the officer discovered a cooler containing liquid codeine located in the trunk of the car.

The driver did not challenge the validity of the initial traffic stop. Instead, he argued that the officer exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither the driver nor the other occupants of the car were its authorized drivers, the officer interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks.

The initial panel decision held that the officer unconstitutionally extended the traffic stop by questioning the driver *before* he began a computer check on the I.D.s and the rental car's registration. The panel also held that the driver's consent to search the vehicle was

involuntary because it was tainted by the Fourth Amendment violation. The underlying conviction was reversed.

The en banc Fifth Circuit found no Fourth Amendment violation and affirmed the conviction. According to the Court, the panel's decision erroneously required the officer to return to the patrol car immediately after the officer learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the car had been reported stolen. Such an approach "misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far." Id. at 507. Instead, the "correct analysis requires district courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." Id. The detention must be temporary and "last no longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." Id., citing Dortch, 199 F.3d 200.

There is no constitutional impediment to an officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and run a computer check on them. Id. at 508. The officer also may ask about the purpose and itinerary of a driver's trip. Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made. All of these inquiries are within the scope of investigation attendant to the traffic stop. Id.

The Court rejected any notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation. Id. "Detention, not questioning, is the evil at which <u>Terry</u>'s second prong is aimed." Id. "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention." Id. A consensual interrogation may follow the end of a valid traffic stop, and such a consensual encounter does not implicate Fourth Amendment concerns. Id.

The officer's questioning of the driver and the occupants was within the scope of the detention justified by the traffic stop, particularly after the officer ascertained that the driver was not the owner or lessee of the vehicle; the lessee was not present in the car; and the versions of the itinerary conflicted. The process, from the time the officer started questioning the driver until he returned to his patrol car to check the registration, lasted only seven minutes.

Equally within the legitimate scope of the stop were the registration and license checks that the officer performed on the vehicle and its occupants. And once the officer learned that one occupant's I.D. card was a fake, he acted reasonably through further questioning to uncover the occupant's true identity and perform a correct background check. Because the officer was still waiting for the computer check at the time that he received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. Id., citing <u>Shabazz</u>, 993 F.2d at 437.

The Fifth Circuit emphasized that there is "no constitutional stopwatch on traffic stops." Id. at 511. Instead the relevant question in assessing whether a detention extends

beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Id. Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means. Id. There is no single formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop. Id. at 512. According to the Court:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: **a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop**. [Emphasis added.]

Id. Because there was no Fourth Amendment violation, the driver's consent to search the vehicle was not unconstitutionally tainted. His consent was voluntarily given, and the evidence obtained from the car was properly obtained as the result of a consensual search. Id.

**Analysis**

There is no question that the initial traffic stop of Defendant was "justified at its inception." United States v. Shabazz, 993 F.2d 431, 435 (5th Cir. 1993), citing Terry, 392 U.S. at 19-20. Carlson's radar gun, which was properly calibrated, clocked Defendant's speed at 75 mph in a 65 mph zone. Carlson had probable cause to stop Defendant for a speeding violation, so the first prong of the Terry test is easily satisfied.

The more difficult question concerns the second part of the <u>Terry</u> test – whether the officers' subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." <u>Shabazz</u>, <u>supra</u>. Under <u>Brigham</u>, the officer's subsequent actions may also be related to "dispelling [the officer's] reasonable suspicion developed during the stop." <u>Brigham</u>, 382 F.3d at 507.

Carlson was well within the law to question Defendant about the lack of a registration for the vehicle, the identity and whereabouts of the owner and about Defendant's travel plans. <u>Id</u>. at 508. Given the inconsistent information supplied by Defendant and the passenger and their extremely nervous behavior, Carlson was justified in further extending the length of the stop and seeking Defendant's consent to search the car. Defendant's hands were shaking badly; the passenger was very tense and stared straight ahead; Defendant did not have registration for the vehicle; Defendant claimed he was driving the vehicle to Texas to return it to a friend who had flown back to Texas after the vehicle broke down, but he could not explain why the friend did not fix the car and drive it home himself; both Defendant and the passenger avoided eye contact and breathed heavily; Defendant stalled before answering questions and displayed false laughter; Defendant claimed the passenger was a good friend and roommate, but he did not know his last name; the passenger did not know Defendant's last name; and Defendant stated they had attended the passenger's father's funeral on Sunday, while the passenger stated the funeral was on Friday. Considering the totality of the circumstances faced by Carlson during the stop, his suspicion that the vehicle might contain illegal drugs was reasonable. As in <u>Brigham</u>, Carlson had a right to rely on

his experience in concluding that the circumstances presented indicated Defendant and his passenger might be lying. <u>Brigham</u>, 382 F.3d at 508.

A consensual search is a well-settled exception to the warrant requirement. <u>United States v. Navarro</u>, 169 F.3d 228, 231 (5th Cir. 1999). In determining whether a search based upon consent is valid, the government must prove that the search was voluntary and that the defendant consented to the search or consent was obtained from a third party with the ability to give valid consent. <u>United States v. Jenkins</u>, 46 F.3d 447, 451-452 (5th Cir.1995). In determining whether a consent to search is voluntary, the Fifth Circuit reviews several factors, no one of which is dispositive. These factors include: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. <u>Id</u>.

Carlson obviously wanted the consent to search to flow from what Defendant perceived as a consensual encounter, so he employed the Lt. Columbo gambit: Carlson issued a warning ticket to Defendant, told him he was free to go, allowed Defendant to begin to return to his car, then engaged Defendant in further conversation. However, Carlson candidly admitted that Defendant was never free to leave, and if Defendant had expressed a desire to leave, Carlson would have told him he was being detained. Carlson suspected all along there were drugs in the car, and he wanted to find them. His suspicion of illegal drug trafficking distinguishes this case from <u>Dortch</u>, <u>Santiago</u> and <u>Jones</u> where there was no

reasonable suspicion of drugs prior to the time the officers' received consent to search. Brigham, 382 F.3d at 510; Schlieve, 159 Fed. Appx. at 544 fn. 19.

Thus, approximately sixteen minutes into the stop, Carlson asked for and obtained Defendant's consent to search the vehicle. This delay was not unreasonable, and there was no evidence that Carlson was stalling for any reason. There also is no evidence that Defendant's consent was obtained as a result of coercion, duress or any other improper means which might cast doubt about its voluntariness.

Defendant was cooperative with Carlson. In fact, Defendant previously offered to let Carlson search the car for guns during their discussion of Defendant's concealed weapons permit. Obviously, Defendant was so sure the drugs were well hidden that he did not believe the drugs would be found.

Defendant believed he was free to leave when, in fact, he was not, but this does not undermine Defendant's consent to the search. Defendant believed he was not being detained and understood that he did not have to consent. Indeed, his claimed hesitation about consenting unless the search was done quickly shows that Defendant understood he could refuse consent to search and drive on. Defendant's custody status is simply one factor in evaluating the voluntariness of his consent; it is not dispositive. United States v. Nicholson, 983 F.2d 983, 988 (10th Cir. 1993); United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000), vacated on other grounds, 532 U.S. 1036 (2001). Considering the totality of the circumstances, Navarro, 169 F.3d at 231, Defendant's consent to search was given voluntarily and freely.

Defendant testified that his consent to the search was based on Carlson's statement that the search would only take a few seconds and that he did not understand that Carlson would search the inside of the vehicle. That testimony is not credible, and it is inconsistent with the fact that Defendant previously offered to let Carlson search the car during their discussion regarding Defendant's concealed weapons permit. Defendant, as the individual with knowledge of the contents of his vehicle, is responsible for limiting his consent to search the vehicle. United States v. Mendoza-Gonzalez, 318 F.3d 663, 667 (5th Cir. 2003). It is well established in the Fifth Circuit that a request to take "look in" in a vehicle is the equivalent of a request for general consent to a search. Id.; United States v. Crain, 33 F.3d 480, 484 (5th Cir.1994), cert. denied, 513 U.S. 1169 (1995)("an individual's consent to an officer's request to 'look inside' his vehicle is equivalent to general consent to search the vehicle and its contents"); United States v. McSween, 53 F.3d 684, 687 (5th Cir. 1995)(consent to search gave officer authority to search under hood of car). That is the law in many other circuits, as well. See, e.g., United States v. Harris, 928 F.2d 1113, 1117 (11th Cir.1991) (search of container found in trunk of vehicle after permission given to "look" in vehicle held to be within the scope of consent) ; United States v. Boucher, 909 F.2d 1170, 1174-75 (8th Cir.1990) (consent to "look in" defendant's vehicle included permission to thoroughly search the vehicle and did not limit the officer to a "cursory look through the windows"); United States v. Espinosa, 782 F.2d 888, 892 (10th Cir.1989) (concluding that defendant's consent to officer's request to "look through" defendant's automobile authorized officer to conduct thorough search of vehicle). See also, United States v. West, 219 F.3d

1171, 1177 (10th Cir. 2000)(where suspect does not limit the scope of the search and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle); United States v. Cienfuegos-Paz, 130 Fed. Appx. 682, 683 (5th Cir. 2005)("at no time did [defendant] protest the scope of the search or otherwise attempt to withdraw his consent, even though the consent form stated he could terminate the search at any time").

A reasonable person would have understood that the consent to search that Carlson requested (and that Defendant and the passenger provided) included a search of the inside of the car. Florida v. Jimeno, 500 U.S. 248, 251 (1991)(standard for measuring scope of consent is objective reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect); United States v. Mendez, 431 F.3d 420, 426 (5th Cir. 2005).

Once consent to search is given, it may be revoked or withdrawn. United States v. Ho, 94 F.3d 932, 935 (5th Cir. 1996). If a person effectively withdraws his consent, then the search must stop. United States v. de la Rosa-Valenzuela, 993 F.Supp. 466, 470 (W.D. Tex. 1997). Defendant's subsequent requests to leave the scene during the consensual search (Supp. Tr. 9, 16, 18) did not amount to an unambiguous act or statement of the withdrawal of his prior consent to search. In U.S. v. Alfaro, 935 F.2d 64, 67 (5th Cir.1991), a prison guard employee consented to searches as part of his employment agreement. Prior to a search, which was precipitated by a suspicion that one or more employees were bringing illegal drugs into the prison, the defendant stated: "I have to go outside and talk to

Lieutenant [Steve] Morville." The Fifth Circuit found that the defendant's statements fell "far short of an unequivocal act or statement of withdrawal, something found in most withdrawal of consent cases." The court cited United States v. Miner, 484 F.2d 1075 (9th Cir.1973) (prospective airline passenger balked at search of luggage, saying "No, it's personal"); United States v. Dichiarinte, 445 F.2d 126 (7th Cir.1971) (defendant exclaimed "[t]he search is over. I am calling off the search"); United States v. Bily, 406 F.Supp. 726 (E.D. Pa.1975) (defendant stated "[t]hat's enough. I want you to stop"); United States v. Ibarra, 731 F.Supp. 1037 (D. Wyo. 1990) (motorist closed and locked trunk).

According to the Fifth Circuit, Mr. Alfaro's hesitancy placed his argument within the ambit of United States v. Brown, 884 F.2d 1309, 1312 (9th Cir.1989), cert. denied, 493 U.S. 1025 (1990), where a defendant who consented to a search of his suitcase, but then became extremely reluctant to hand over his suitcase keys, was held not to have taken back his consent. Furthermore, expression of impatience over the length of a search does not establish an intent to revoke consent. United States v. Brown, 345 F.3d 574, 580-581 (8th Cir. 2003); United States v. Ross, 263 F.3d 844, 846 (8th Cir. 2001)(defendant indicated that he needed to be on his way). See also United States v. Pelle, 2006 WL 436920 (D.N.J) and the cases cited therein.

At no time did Defendant ever tell (or imply to) Carlson or any other officer on the scene that he was revoking or withdrawing his consent to the roadside search. Asking "Can I go?" (Supp. Tr. 9) is altogether different from expressing his desire that the search stop. Significantly, when Defendant was pressed on cross-examination as to whether he ever told

the officers to stop looking in the vehicle, Defendant replied: "Only thing I told him is (sic) if I was able to go." Supp. Tr. 17-18. Perhaps Defendant intended or expected that the officers would interpret his request to leave as a revocation of his consent to search, but the officers were not unreasonable in failing to jump to that conclusion. While a defendant need not use magic words to revoke his consent, a reasonable person in Defendant's situation would have, if he wished to revoke his prior consent to a search, said unequivocally that he wanted the search to stop.

Even if Defendant's request for permission to leave could be considered a withdrawal of his consent to search, suppression of the evidence would still not be appropriate. While it is unknown (due to the lack of audio) exactly when Defendant asked to leave, Carlson's response to Defendant "No, until the dog comes" (Supp. Tr. 9) shows that, by the time Defendant asked to leave, the K-9 was already on the way. The drugs were not found and the incriminating statements were not made until after the K-9 alerted and the car was removed to fleet services for a more thorough search. Defendant's continued brief detention between the time Defendant asked to leave and the time the K-9 search was completed was justified given Carlson's reasonable suspicion that drugs were in the car. As noted previously, the K-9 arrived within eighteen minutes of Carlson's request for a K-9. Tr. 24-25.

It is troublesome that the entire process from the initial stop to the discovery of the drugs took so long to complete, but the court is mindful of the Fifth Circuit admonition in Brigham that there is no "constitutional stopwatch" on traffic stops. The car was searched

thoroughly for about thirty minutes before Carlson requested a K-9. The K-9 arrived eighteen minutes later, which was over an hour after the stop began. Carlson could have requested a K-9 sooner, which would have led to a quicker K-9 alert and probable cause for further searching. Cf. Schlieve, 159 Fed. Appx. at 544 (police were not dilatory in following up on their suspicions, despite the fact that it was over an hour between the return of the license and the arrival of the dog). However, the officers need not follow a particular recipe in conducting their investigation. Brigham 382 F.3d at 511-512 ("[T]he question is not simply whether some other alternative existed, but whether the police acted unreasonably in failing to recognize and pursue it."). Under the circumstances of this case, Carlson did not act unreasonably in deferring a request for the K-9 until his initial search was unsuccessful.

Once the K-9 alerted on the vehicle, the officers had probable cause to search it. United States v. Sanchez-Pena, 336 F.3d 431, 444 (5th Cir. 2003)("We have repeatedly affirmed that an alert by a drug-detecting dog provides probable cause to search."); United States v. Zucco, 71 F.3d 188, 191-192 (5th Cir. 1995)(once dog alerted to the interior wall of the van, police had probable cause to dismantle the wall). The evidence establishes that the dog, Kay, was reliable and that she and her handler, Officer Adams, were properly trained and certified. Thus, the dog's strong alert provided probable cause that drugs were in the car and justified further searching of the car and the continued detention of Defendant and his passenger.

After another twenty minutes of unsuccessful searching, the officers removed the car to fleet services, which was a safer location for a continuation of the search and where

additional tools would be available.  Removal of the car to fleet services was proper.  "If probable cause justified a warrantless search on the roadside, it likewise justified one at the station after the car was impounded." United States v. McSween, 53 F.3d 684, 689 (5th Cir. 1995).  See also United States v. Audon Cienfuegos-Paz, Crim. No. 03-50130 (W.D. La. 2004)("Once the dog gave an alert on the undercarriage of the vehicle, the officers had probable cause to conduct the further search of the automobile back at the headquarters where they could put the vehicle on a rack and complete a search of the undercarriage."), affirmed, 130 Fed. Appx. 682, 683 (5th Cir. 2005). At fleet services, the rear door panels were removed and the drugs were found at approximately 7:30 p.m., or about two and a half hours after the K-9 alerted.

Once the drugs were found, Defendant was read his Miranda rights, and he voluntarily made the incriminating statements that are at issue in the case.  There is no evidence of any coercive or improper police tactics during the interview.  Defendant's request that the tape recorder be turned off before he made the incriminating statements shows a level of sophistication that belies his present argument that his statements were involuntary.  Because no Fourth Amendment violation preceded Defendant's interview, Defendant's incriminating statements need not be suppressed as fruit of the poisonous tree.

**Conclusion**

What began as a routine traffic stop supported by probable cause for speeding led to reasonable suspicion of illegal drug trafficking, which in turn led to a consensual search, a K-9 sniff, and probable cause that the car contained illegal contraband concealed within it.

Despite the length of time between the initial stop and the eventual discovery of the illegal narcotics, the officers in this case acted diligently and reasonably to confirm or dispel their suspicions and did not unduly delay their investigation. An evaluation of the totality of the circumstances reveals that Defendant's consent to search was freely and voluntarily given and that his post-<u>Miranda</u> incriminating statements were freely and voluntarily made.

Accordingly;

**IT IS RECOMMENDED that Defendant's Motion to Suppress (Doc. 9) be denied.**

## <u>Objections</u>

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Cr. P. 59(b)(2). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. <u>See</u> <u>Douglass v. U.S.A.A.</u>, 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED at Shreveport, Louisiana, this 10th day of May, 2006.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE