RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE  11 / 30 / 06
BY   DM

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

UNITED STATES OF AMERICA

versus

FERNANDO HERRERA

CRIMINAL NO. 05-50112-01
JUDGE TOM STAGG

## SENTENCING MEMORANDUM

On November 16, 2005, the grand jury returned an indictment charging Fernando Herrera with knowingly and intentionally conspiring to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. On July 13, 2006, Mr. Herrera entered a plea of guilty and sentencing was ultimately set for November 17, 2006. In due course, a Presentence Report was issued and responded to by the defendant.

In his letter of October 25, 2006, to the probation office, Stephen Glassell outlined the basis of four objections to the PSR: (1) the two point weapon add-on (U.S.S.G. § 2D1.1(b)(1)), (2) the four point role-in-the-offense add-on (U.S.S.G. § 3B1.1(a)), (3) the kilogram quantity of methamphetamine, and (4) the denial of the safety-valve application (U.S.S.G. §§ 2D1.1(b)(9) and 5C1.2).

In his letter, counsel noted (in connection with objection four),

> "I realize that for this provision to apply we have to convince you and Judge Stagg that Herrera was not the organizer, leader, manager, or supervisor. We will also have to convince both of you that Herrera did not possess a firearm in connection with this offense."

Based on the teaching of United States v. Huerta, 182 F.3d 361 (5th Cir. 1999), a sentencing hearing was held on November 17, 2006 and evidence on contested facts was elicited. At the hearing, the court heard testimony of only two witnesses and examined documents entered into evidence. The government's witness was Jason Turner, a resident of Arlington, Texas, who testified to his purchases of large quantities of methamphetamine from the defendant, Fernando Herrera. Their relationship began in the spring or summer of 2004 during a meeting at Joshua Turner's (Jason's brother) residence in Phoenix and continued for approximately six months- ending when Herrera was arrested, while driving Turner's car in Flagstaff, Arizona. Herrera was bringing methamphetamine to Turner on that trip. A month or so later, on December 13, 2004, Turner was arrested and immediately began cooperating with the authorities.

Turner pled guilty to one count of conspiracy to distribute over 500 grams of methamphetamine and, in accordance with his guilty plea, continued his cooperation with the government.

Turner received four to eight pounds of methamphetamine every two weeks at $8,000.00 to $9,000.00 per pound.[1] The methamphetamine originated in Mexico and was "fronted" to him by Herrera. Turner's testimony outlining the drug scheme was entirely credible. His total estimated earnings during the six months of five to six hundred thousand dollars was as astonishing as the estimated two million dollars paid to Herrera.

Cross-examination by defense counsel failed to produce any diminution of his credibility. Questions about a defendant's cooperation with the government in hopes of a sentence reduction does not serve to diminish the credibility of one who has <u>fully</u> cooperated since the day of his arrest.

Herrera testified on his own behalf and told of a business relationship diametrically opposite that described by Turner. He was, essentially as he described it, a "mule." He said he made two trips to Arlington to deliver to Turner and was on his third trip when he was arrested. The trips would begin by a flight from Phoenix to Dallas, Turner would supply a rental car to be driven to Phoenix and back, followed by Herrera flying back to Phoenix. Turner's denouement arose out of Herrera using Turner's Volvo to make the third trip, resulting in Herrera's arrest

---

[1] The court notes that Turner's testimony relayed weekly deliveries of methamphetamine, whereas the PSR reports bi-monthly deliveries.

in Flagstaff with two pounds of "ice" behind the door panels.

The most damning evidence, totally destructive of Herrera's credibility, was Government Exhibit 1 (copy attached). Herrera's testimony referred to a request to him by Jason Turner for a favor to rent a safe deposit box: "Mr. Turner told me about if I make him a favor, I'll get him a safe deposit box because he had too many people in his house, and he would put the money there if I put it in my name." Unedited Sentencing Transcript at 66, lines 16-18. Government Exhibit 1 is a copy of the bank's safe deposit entry records, showing Herrera opening the box account on August 14, 2004 and their joint signatures occurred on August 23, 2004. Totally unexplained was the cold record of Herrera's entry into that box:

> Q: And you opened it, and did you go back later with Mr. Turner so he could also be on the safe deposit box?
> A: I really don't remembers [sic].
> Q: And do you remember that you entered the box on ten occasions between its being opened in August and the last date of March of '05?
> A: I remember going inside to put money or sometimes pick the money for Jason.
> Q: Did you know that you did it on at least ten occasions?
> A: I really don't remember.

Unedited Sentencing Transcript at 77, lines 14-24.

Comparing Herrera's testimony of only <u>two</u> completed delivery trips to Texas with the bank's record of <u>ten</u> dates on which he entered the safe deposit box over a period of several months results in solid evidence of a very involved, major

methamphetamine dealer, as described by Jason Turner. Adding to his credibility deficits were the two notes found in the safe deposit box, one bearing the telephone number in Mexico where Herrera could be reached-- his grandmother's house. Herrera <u>repeatedly</u> denied writing the notes.[2]

According to the sworn testimony of a twenty-five year-old American citizen who admitted to a ninth grade education,[3] "I saw the note. I don't write English." INCREDIBLE! By the tenth grade, at age 15 or 16, he was in high school. How did he write themes, take exams, pass from one grade to the next for nine years??

Although Herrera claims some trips to the Dallas area involved visits with family members, his failure to present any evidence of the dates or the occasions for the visits leaves unrebutted the testimony of Turner, buttressed completely by the bank records in Government Exhibit 1. In short, the court finds Herrera's sworn testimony to be a tissue of lies, big ones and little ones. As between the two witnesses at the hearing, Jason Turner told the truth and Fernando Herrera did not.

---

[2] The first note found in the safe deposit box read: "Jason if you show up call me ok my number from Mexico 0115268656 10351 ask for me ok go to my Brother I'am in prisian." A second note, dated Wednesday, March 23, 2005, at 12:03 read: "I'am looking for you. You are my Brother Jason see you latter call me. You Brother 10-4."

[3] The PSR shows his education ended while attending North High School in Phoenix in the tenth grade.

In United States v. Alford, the language is clear: "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole. . . . A district court may adopt facts contained in the PSR without further inquiry if the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence." United States v. Alford, 142 F.3d 825, 831-32 (5th Cir. 1998). If a defendant objects to the information contained within the PSR "with specificity and clarity," United States v. Ponce, 917 F.2d 846, 848 (5th Cir. 1990), the court "must resolve [those] disputed issues of fact if it intends to use those facts as a basis for sentencing . . . ." United States v. Huerta, 182 F.3d 361, 364 (5th Cir. 1999). The "defendant's rebuttal evidence must demonstrate that the information contained in the PSR is materially untrue, inaccurate or unreliable, and mere objections do not suffice as competent rebuttal evidence." Id. (internal marks omitted).

Here, the court has considered the facts set forth by the PSR, as well as the defendant's factual objections thereto, and has determined the PSR to be more reliable. See United States v. Reyna, 130 F.3d 104, 112 (5th Cir. 1997). There was no credible evidence presented that serves as rebuttal evidence to the findings in the PSR.

Turning now to the four objections contained in the defendant's response to the PSR:

## OBJECTION ONE

The objection on weapons is overruled. Turner testified that two Mexicans, "Uriel" and "Roberto," came to live in his home after he reported to Herrera his anxiety that the quantity of methamphetamine and money in his house made him nervous. The two men, sent by Herrera, had weapons.

However, notwithstanding the weapons possessed by "Uriel" and "Roberto," Turner testified that Herrera, too, possessed firearms.

> Q: Did you ever see Fernando with a gun?
> A: Yes.
> Q: When and where?
> A: He came to my house with an AK-47 and a 9 millimeter.

Unedited Sentencing Transcript at 30, lines 13-17.

For these reasons, the two-point add-on is appropriate and sustained by the record.

## OBJECTION TWO

The role-in-the-offense objection is overruled. U.S.S.G. § 3B1.1(a) provides for a four-level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ."

Having made a finding that the defendant's testimony was <u>not</u> credible- that he was <u>not</u> just a mule on his third trip when arrested- the status of Herrera fits the requirement of five or more participants <u>and</u> the activity was "otherwise extensive."

Reviewing the PSR and the transcript of the hearing, a roll-call of "five or more" participants is not difficult. In no particular order: Turner, Herrera, "Uriel," "Roberto," Martin (money man from Mexico), Brandon (driver), Willbanks (driver),[4] two unnamed drivers sent by Herrera,[5] and Jessie, Herrera's brother who received money transmitted by Turner. Turner's distribution organization is not included in this finding.

The "or was otherwise extensive" provision serves to further buttress the correctness of the four additional points. Turner received four to eight pounds of methamphetamine every other week for six months. A particular exchange during the cross-examination of Turner is illuminating:

> Q: How much money did you make dealing in drugs for that time period, that six months, best guess?
> A: Five, $600,000 maybe.
> Q: Pardon?
> A: Five to $600,000, I'm assuming, if I just had to guess.
> Q: Is that how much you cleared or how much you dealt during that

---

[4] See Unedited Sentencing Transcript at 42, line 16.

[5] See Unedited Sentencing Transcript at 7, line 20.

-8-

time period?
A: No. That would be a guesstimate of how much was my take.
Q: Five to $600,000?
A: Yeah.
```

Unedited Sentencing Transcript at 40, lines 3-14.

On redirect, this additional colloquy occurred:

Q: And you have no idea what Mr. Herrera or his organization made?
A: No. I mean I-- based on-- an exact amount, no, because I don't know. I just know what I paid him. I don't know--
Q: Do you know how much you paid him approximately during that time period for meth, all total?
A: Probably right around $2 million.

Unedited Sentencing Transcript at 43, lines 16-23.

These sums of money and the bi-monthly delivery of large amounts of methamphetamine adequately fulfill the language of the guidelines. The dealings between Herrera and Turner were "otherwise extensive."

## OBJECTION THREE

Objection three is overruled for the reasons set forth above. The quantity of methamphetamine in the PSR is appropriately calculated.

## OBJECTION FOUR

Objection four is overruled as well. Herrera does not qualify for the safety valve provision in the guidelines. The weapons finding and the leadership finding exclude him, even though he is a first time offender.

## CONCLUSION

The defendant has failed to demonstrate that the information in the PSR, relied on by this court, is materially untrue. See Alford, 142 F.3d at 832. Therefore, sentencing will be in accordance with the guideline calculation in the PSR, the findings of which were adopted.

THUS DONE AND SIGNED, in chambers, in Shreveport, Louisiana, this 30 day of November, 2006.

JUDGE TOM STAGG

* General Note: The reader should be aware that the "Unedited Sentencing Transcript" references made herein are references to the court reporter's Realtime file. A Realtime file should not be considered as a certified transcript. Once a certified transcript of the sentencing hearing is made available to the parties, the page and line numbers cited herein should be disregarded, as those numbers will differ from the ones found in the certified transcript.