RECEIVED
APR 1 2 2011
TONY R. MOORE, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

UNITED STATES OF AMERICA

versus

FERNANDO HERRERA

CRIMINAL NO. 05-50112-01
JUDGE TOM STAGG

## MEMORANDUM RULING

Before the court are three motions filed by Fernando Herrera ("Herrera"), pursuant to 28 U.S.C. § 2255, seeking to vacate, set aside, or correct his sentence. See Record Documents 50, 54 and 58. Based on the following, Herrera's motions are **DENIED**.

## I. BACKGROUND

A federal grand jury returned a one-count indictment against Herrera charging him with knowingly and intentionally conspiring to distribute fifty grams or more of methamphetamine or five hundred grams or more of a mixture or substance containing methamphetamine. See Record Document 4. Herrera pleaded guilty to the charge and was sentenced to three hundred twenty-four months of imprisonment. See Record Documents 38 and 39.

The presentence investigation report ("PSR") and the guilty plea testimony revealed that Herrera's offense involved 21.77 kilograms of methamphetamine, which resulted in a base offense level of 38 pursuant to United States Sentencing Guideline section 2D1.1(a)(3)(C)(1). The offense level was enhanced by two levels for possession of a dangerous weapon and by four levels for Herrera's role in the offense as a leader or organizer of at least five participants. Herrera's adjusted offense level became 44 and was reduced by three levels for acceptance of responsibility. The resulting total offense level of 41 combined with Herrera's criminal history category of I yielded an advisory guideline sentencing range of 324-405 months of imprisonment.

Herrera filed objections to the two-level enhancement for possession of a dangerous weapon, the four-level enhancement for his role in the offense, and the amount of methamphetamine. Herrera also requested that the court consider the safety valve provisions of the guidelines provided in 18 U.S.C. §§ 3553(f)(1-5).

A sentencing hearing was held on November 17, 2006, at which the court heard the testimony of two witnesses and examined documents entered into evidence. The government's witness was Jason Turner, a resident of Arlington, Texas, who testified to his purchases of large quantities of methamphetamine from Herrera. According to Turner, their relationship began in the spring or summer of

2004 during a meeting at Joshua Turner's (Jason's brother) residence in Phoenix and continued for approximately six months. He testified that the relationship ended when Herrera was arrested, while driving Turner's car in Flagstaff, Arizona. Herrera was bringing methamphetamine to Turner on that trip. A month or so later, on December 13, 2004, Turner was arrested and immediately began cooperating with the authorities. Turner pled guilty to one count of conspiracy to distribute over 500 grams of methamphetamine and, in accordance with his guilty plea, continued his cooperation with the government.

Turner testified that he received four to eight pounds of methamphetamine every two weeks at $8,000.00 to $9,000.00 per pound.[1] The methamphetamine originated in Mexico and was "fronted" to him by Herrera. Turner testified that his total estimated earnings during the six months were five to six hundred thousand dollars and that during that same time, he paid Herrera an estimated two million dollars. The court found that Turner's testimony outlining the drug scheme was entirely credible. Cross-examination by defense counsel failed to produce any diminution of his credibility.

---

[1] Turner's testimony relayed weekly deliveries of methamphetamine, whereas the PSR reported bi-monthly deliveries.

Herrera testified on his own behalf and told of a business relationship diametrically opposite to that described by Turner. As he described it, he was essentially a "mule." He said he made two trips to Arlington to deliver drugs to Turner and was on his third trip when he was arrested. The trips would begin with Herrera flying from Phoenix to Dallas. Turner would supply a rental car for Herrera to drive to Phoenix and back, followed by Herrera flying back to Phoenix.

The court found the most damning evidence, destructive of Herrera's credibility, to be Government Exhibit 1, a copy of a safe deposit box entrance record. See Record Document 37, Ex. 1. Herrera testified that Turner asked him to rent a safe deposit box: "Mr. Turner told me about if I make him a favor, I'll get him a safe deposit box because he had too many people in his house, and he would put the money there if I put it in my name. [sic]" Sentencing Hearing Transcript at 67. Government Exhibit 1 showed Herrera opening the safe deposit box account on August 14, 2004, and his and Turner's joint signatures occurring on August 23, 2004. See Record Document 37, Ex. 1. The entrance record also showed Herrera accessing the box on multiple occasions. The court then compared Herrera's testimony of only two completed drug delivery trips to Texas with the bank's record of ten dates on which he entered the safe deposit box over a period of several months. The court found the record of Herrera's entry into that box unexplained:

4

> Q: And you opened it, and did you go back later with Mr. Turner so he could also be on the safe deposit box?
>
> A: I really don't remembers [sic].
>
> Q: And do you remember that you entered the box on ten occasions between its being opened in August and the last date of March of '05?
>
> A: I remember going inside to put money or sometimes pick the money for Jason.
>
> Q: Did you know that you did it on at least ten occasions?
>
> A: I really don't remember.

Sentencing Hearing Transcript at 78. This comparison resulted, in the court's view, in solid evidence of a "very involved, major methamphetamine dealer, as described by Turner." Record Document 37 at 4-5.

The court further noted that two notes found in the safe deposit box, one bearing the telephone number in Mexico where Herrera could be reached at his grandmother's house, added to Herrera's credibility deficits. Herrera, a twenty-five year-old American citizen who admitted to a ninth grade education,[2] had repeatedly denied writing the notes and testified: "I saw the note. I don't write English."

---

[2] The PSR shows his education ended while attending North High School in Phoenix in the tenth grade.

5

Sentencing Hearing Transcript at 68. The court found this testimony highly questionable.

The court acknowledged that Herrera claimed some trips to the Dallas area involved visits with family members. However, his failure to present any evidence of the dates or the occasions for the visits left unrebutted the testimony of Turner, buttressed completely by the bank records in Government Exhibit 1. Therefore, the court concluded that Herrera's sworn testimony was "a tissue of lies, big ones and little ones." Record Document 37 at 5. The court found that as between the two witnesses at the hearing, "Jason Turner told the truth and Fernando Herrera did not." Id.

Following the hearing addressing all of the objections raised by Herrera, the court found no credible evidence to rebut the presentence report and adopted the factual findings contained therein. The court agreed with the calculation of the advisory guideline range and overruled Herrera's objections to the PSR. This court also issued a sentencing memorandum, detailing its reasoning for the sentence it was imposing. See Record Document 37. Herrera was given a sentence of 324 months of imprisonment, a sentence at the bottom of the guideline range. See Record Document 39. The Fifth Circuit affirmed Herrera's sentence. See Record Document

49. Thereafter, Herrera filed the instant motions. See Record Documents 50, 54 and 58.[3]

## II. LAW AND ANALYSIS

Herrera's principal complaint in his section 2255 motion is that he wished to testify about the reasons for his trips to the safe deposit box and other matters to illustrate that his testimony was more credible than Turner's. According to Herrera, his testimony about his trips to the safe deposit box would have indicated that he was not the leader of the conspiracy and would have prevented the court from believing Turner about other issues that resulted in increases to his guideline calculation. He asserts that his counsel suggested that he not testify as to these matters.

When a defendant argues that his counsel interfered with his right to testify, "[t]he appropriate vehicle for such [a] claim[] is a claim of ineffective assistance of counsel" under Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Sayre v. Anderson, 238 F.3d 631, 634 & n.2 (5th Cir. 2001) (citation omitted). To prevail on a claim of ineffective assistance of counsel, Herrera must prove that (1) his counsel's actions fell below an objective standard of reasonableness and (2) his counsel's ineffective assistance was prejudicial. See

---

[3]Initially, this court denied Herrera's section 2255 motion as untimely. See Record Document 51. However, upon Herrera's motion for reconsideration, that ruling was stricken and the section 2255 motion was fully briefed by the parties.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; Bryant v. Scott, 28 F.3d 1411, 1414-15 (5th Cir. 1994).

Under the first prong of the Strickland analysis, the court is to presume that the attorney's actions are encompassed within the wide range of reasonable competence and fall under the ambit of trial strategy. See Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Herrera may overcome this presumption only by showing that under the "totality of the circumstances," the attorney's performance was "outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066.

Under the second prong of the Strickland test, Herrera must show "that there is a reasonable probability that, but for counsel's specified errors, the result of the proceeding would have been different." Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. To satisfy the prejudicial prong of the Strickland test in the context of a non-capital sentencing proceeding, Herrera must establish that he would have received less time in prison. See United States v. Grammas, 376 F.3d 433, 438 (5th Cir. 2004). If Herrera fails to establish either prong of the Strickland test, then his claim of ineffective assistance of counsel must fail.

A.   **Reasonableness.**

Herrera is unable to meet the first prong of <u>Strickland</u> because he has failed to set forth evidence showing that his counsel's failure to elicit testimony on certain matters was unreasonable. Herrera contends that his counsel should have allowed him to testify, because the lack of testimony as to specific matters led the court to believe that Herrera was not credible and that Turner was credible. Herrera asserts that "[l]argely as a result of [the] disparity between Mr. Herrera's testimony about the number of trips he made with drugs and the number of times he was clearly at the safety deposit box, the district court concluded that Mr. Herrera was not credible." Record Document 58 at 6. He contends that "former defense counsel not only failed to ask Mr. Herrera important questions to address his credibility, but affirmatively instructed Mr. Herrera not to admit that he went to the safety deposit box ten times and explain why he went to the box ten times." <u>Id.</u> at 9.

Herrera, however, fails to note that there were many reasons that the court did not find him credible. Although Herrera's unexplained trips to the safe deposit box were a factor in the court's ultimate determination as to Herrera's lack of credibility, other facts and testimony also influenced this conclusion. For example, as previously mentioned, during the sentencing hearing, the government introduced two notes that were found in the safe deposit box. One of the notes stated: "Jason if you show up call

9

me ok my number from Mexico 011526865610351 ask for me ok go to my Brother I am in prisian [sic]." Record Document 37, Ex. 3. The second note stated: "I am looking for you. You are my Brother Jason See you latter call me. You Brother 10-4. [sic]" Id. On the top, right-hand corner of the second note the date and time were written: "Date Wed Mar 23 05 Time 12:03." Id. During the sentencing hearing, Herrera repeatedly denied writing the notes, although he admitted that the telephone number on the first note was his grandmother's number. See Sentencing Hearing Transcript at 68, 80-81. In addition to denying writing the notes, Herrera testified: "I saw the note. I don't write English." Id. at 68.

In direct contradiction to Herrera's testimony, the safe deposit box entrance record clearly indicated that Herrera entered the safe deposit box on March 23, 2005, the date of the handwritten note that he repeatedly denied writing. See Record Document 37, Ex. 4. At the sentencing hearing, the court stated: "He had to have--if he signed to get in the box and there's a note in the box bearing that date, it's hard for me to believe that he wasn't there and that's not his note." Sentencing Hearing Transcript at 86. In addition, the court took issue with Herrera's statement that he could not write English, pointing out that he had managed to "pass from one grade to the next for nine years." Record Document 37 at 5.

10

Contrary to Herrera's contentions, his attorney questioned him about his trips to the safe deposit box. He also was questioned about his trips to the safe deposit box by the government and by the court. Herrera cannot now complain about the quality or extent of his own answers to the questions posed by his counsel and others. In hindsight, Herrera has now presented his reasons for the trips to the safe deposit box in a more articulate, detailed fashion.[4] However, it is clear that Herrera was provided this opportunity during the sentencing hearing when his attorney asked him to explain the reasons for the trips to the safe deposit box on redirect examination, in addition to other questioning by the government and the court.

The court acknowledges that the testimony by Herrera was unclear as to why he went to the safe deposit box so many times. During cross-examination, Herrera testified that Turner asked him to open a safe deposit box because there were too many people at Turner's house. See Sentencing Hearing Transcript at 67. The court also questioned Herrera about his trips he made to Dallas and about opening the safe deposit box. See id. at 74-75. Thereafter, the government continued with its questioning. Herrera was then questioned about the safe deposit box by his counsel on redirect. He again explained that Turner asked him to open the safe deposit box because there were too

---

[4]Herrera attached an affidavit to his section 2255 motion which details what his alleged testimony would have been.

many people at Turner's house and because Turner trusted him. He testified that he often went to the safe deposit box when Turner wasn't with him because he had "to pick up money or put money there for Jason." Id. at 83-84.

Even if this court, looking back, concludes that Herrera's counsel made the wrong decision by advising him not to explain his trips to the safe deposit box, it cannot grant Herrera's motion absent a finding that the strategy was unreasonable. See also Yarborough v. Gentry, 540 U.S. 1, 8, 124 S. Ct. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). If counsel believes that it would be unwise for the defendant to testify, counsel should advise the client not to testify. See United States v. Teague, 953 F.2d 1525, 1533 (11th Cir. 1992) (en banc), cited by Smith v. Quarterman, 222 F.App'x 406, 412 (5th Cir. 2007). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066. As the Fifth Circuit has noted, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Ogan v. Cockrell, 297 F.3d 349, 360 (5th Cir. 2002). Herrera has failed to demonstrate that his counsel's strategy was unreasonable.

Based on the foregoing considerations, the court finds that Herrera has failed to "show that counsel's actions were not supported by a reasonable strategy" with regard to having advised Herrera not to testify to additional facts at the sentencing hearing. Massaro v. United States, 538 U.S. 500, 501, 123 S. Ct. 1690, 1691-92 (2003) (citing Strickland, 466 U.S. at 690, 104 S. Ct. at 2066). Herrera has not shown that under the "totality of the circumstances," his attorney's performance was "outside the wide range of professionally competent assistance." Strickland at 690, 104 S. Ct. at 2066.

**B.    Prejudice.**

Similarly, Herrera is unable to meet the second prong of Strickland, because he has failed to demonstrate a reasonable probability that, but for his attorney's failure to question him or allow him to testify as to his trips to the safe deposit box, the result would have been different. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Herrera asserts that "had prior counsel elicited truthful testimony that Mr. Herrera now presents, more than a reasonable probability exists that the district court would have concluded that Mr. Herrera was telling the truth, that Mr. Turner was lying, and that Mr. Herrera's sentence would have been significantly lower." Record Document 56 at 2.

In his affidavit, Herrera asserts that he would have testified, inter alia, to the following: (1) that, in truth, he went to the safe deposit box on a number of occasions in his role as a worker under Turner's control; (2) that he was not the leader of a conspiracy and not a source for drugs but instead a mule for Turner; (3) that on three occasions he picked up drugs at Turner's direction, on other occasions he delivered money having to do with drugs, and on other occasions he delivered and picked up cash that Turner was using to buy cars, furniture and appliances; and (4) that Turner was the leader of the conspiracy as shown in large part by his wealthy lifestyle, especially as compared to Herrera's modest lifestyle and $10 per hour job as a security guard. See id. Herrera concludes that "had this testimony been heard, more than a reasonable probability exists that the district court would have made dramatically different conclusions after the sentencing hearing" and his sentence would have been much lower. Id. at 10.

Herrera's argument that had the court heard about Turner's wealthy lifestyle, his sentence would have been greatly reduced, is without merit. The record clearly indicates that both Turner and Herrera were questioned about their lifestyles and all of this information was before the court at the time of sentencing.[5] Therefore, Herrera's

---

[5]For example, during cross-examination by defense counsel, Turner testified that he owned a Mustang, a Lexus, two Corvettes, a Volvo and a Mercedes. He also

14

assertion that his testimony would change the court's opinion as to this issue is simply unfounded.

In addition, Herrera has not convincingly argued that the testimony he now provides in his affidavit would have assisted him at the sentencing hearing. "[T]he mere possibility of a different outcome is not sufficient to prevail on the prejudice prong. Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'" Crane v. Johnson, 178 F.3d 309, 312-13 (5th Cir. 1999). Even had Herrera testified during sentencing to the statements that he now makes in his affidavit, there is simply not a sufficient probability that such statements would have caused this court to disregard his prior inconsistencies and find him more credible than Turner. Accordingly, his contention that his counsel was ineffective fails.

---

testified that he was leasing a house for $1,600.00 per month with drug money. He recalled that Herrera lived in a small apartment. See Sentencing Hearing Transcript at 26-30. Herrera testified that he had lived in Phoenix, Arizona, with his mother but had rented an apartment for $500 a month in 2004 and 2005. He also testified that he owned only one car and that it had been repossessed. See id. at 49, 51 and 61.

## III. CONCLUSION

For the above-cited reasons, Herrera's section 2255 motions (Record Documents 50, 54 and 58) are **DENIED.**

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 12th day of April, 2011.

_____
JUDGE TOM STAGG